**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BEATRICE GIRDLER, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 10-1807 (BAH) |
| | Judge Beryl A. Howell |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

The plaintiffs, Beatrice Girdler and her spouse, Ronald Girdler, brought this action

pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*,

seeking damages for injuries sustained by Mrs. Girdler on October 3, 2008, when she fell on the

sidewalk next to the defendant Smithsonian Institution's ("Smithsonian") National Air & Space

Museum ("NASM").  The plaintiffs claim that the Smithsonian was negligent in maintaining,

inspecting, remediating and forewarning pedestrians about a defect in the sidewalk.  Following a

bench trial, the Court concludes that the plaintiffs have failed to sustain their burden of proof and

that judgment must be entered for the defendant.

## I.      PROCEDURAL BACKGROUND

On October 26, 2010, the plaintiffs filed their two-count complaint against the United

States of America asserting, in Count 1, negligence and, in Count 2, loss of consortium.[1]

---

[1] The plaintiffs limited Count 2 for loss of consortium to Mr. Girdler's loss of household services, with all claims as
to loss of sexual relations waived.  Trial Tr. 27:9-11; 39:1-4, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52 (Q.
"Now, is it my understanding that the only claim you have for loss of consortium is the claim for loss of household
services?"  Ronald Girdler A: "That's correct.")

Compl., ECF No. 1.[2]  The plaintiffs allege that the defendant failed properly to inspect, maintain,

remedy defects in, and warn of unsafe conditions in the "public sidewalk adjacent to the

[NASM] on the North side of the 400 block of Independence Avenue SW," *id*. ¶¶ 4-9, and that

breaches of those duties proximately caused permanent injuries to Mrs. Girdler's "mind, body

and nervous system," *id*. ¶ 13.  The Complaint seeks $2,000,000 in compensatory damages, plus

costs and attorney's fees, under the FTCA.  *Id*. at 4.

        This Court conducted a bench trial from July 9 through July 11, 2012.[3]  The following six

witnesses were called by the plaintiffs to testify: Beatrice Girdler, Ronald Girdler, Craig T.

Arntz, M.D., Lawrence Dinoff, Richard Lurito, Ph.D., and Mark Proctor.  The testimony of Dr.

Arntz was presented through a *de bene esse* videotaped deposition taken on June 18, 2012,

shortly before trial began.  *See* Pls.' Ex. 66.  The defendant called the following five witnesses to

testify: Richard W. Barth, M.D., Anthony M. Dolhon, P.E., Gloria J. Hurdle, Ph.D., Rahmat

Muhammad, Ph.D., and Nancy Bechtol.  Prior to trial, pursuant to the Pretrial Order, the parties

submitted affidavits from their expert witnesses, which were to serve in lieu of direct testimony

during the bench trial.  *See* Pretrial Order, June 22, 2012, ECF No. 33.[4]

        Following the conclusion of the bench trial, the parties submitted proposed findings of

fact and conclusions of law.  *See* Def.'s Proposed Findings of Fact and Conclusions of Law

("Def.'s Findings & Conclusions"), July 18, 2012, ECF No. 48; Pls.' Proposed Findings of Fact

---

[2] This case was re-assigned to the presiding Judge on January 20, 2011.

[3] The transcripts of the bench trial have been placed on the docket as follows: July 9, 2012 P.M., ECF No. 49; July 10, 2012 A.M., ECF No. 53; July 10, 2012 P.M., ECF No. 50; July 11, 2012 A.M., ECF No. 52; and July 11, 2012 P.M., ECF No. 51.  Citations to the trial transcript will indicate, if not otherwise apparent from the context, the name of the witness testifying to the information referenced.

[4] The parties filed the following affidavits by their expert witnesses: Aff. of Richard J. Lurito, Ph.D. ("Lurito Aff."), Pls.' Ex. 58, ECF No. 37; Aff. of Lawrence C. Dinoff ("Dinoff Aff."), Pls.' Ex. 55, ECF No. 38; Aff. of Richard W. Barth, M.D. ("Barth Aff."), Def.'s Ex. 10, ECF No. 40; Aff. of Anthony M. Dolhon ("Dolhon Aff."), Def.'s Ex. 14, ECF No. 41; Aff. of Gloria J. Hurdle, Ph.D. ("Hurdle Aff."), Def.'s Ex. 22, ECF No. 42; and Aff. of Rahmat Muhammad, Ph.D. ("Muhammad Aff."), Def.'s Ex. 20, ECF No. 43.

and Conclusions of Law ("Pls.' Findings & Conclusions"), July 16, 2012, ECF No. 47.[5]   The

Court has considered these filings along with the evidence admitted at trial and the arguments of

counsel.

Based upon the testimony presented and exhibits admitted at the bench trial, the Court

makes the findings of fact set forth below and further states its conclusions of law.  *See* FED. R.

CIV. P. 52(a)(1) ("In an action tried on the facts without a jury . . . , the court must find the facts

specially and state its conclusions of law separately.  The findings and conclusions may be stated

on the record after the close of the evidence or may appear in an opinion or a memorandum of

decision filed by the court.").

## II.     FINDINGS OF FACT

### A.     Overview of Witnesses' Backgrounds and Testimony

#### 1.     Plaintiffs' Witnesses

a.   *Plaintiff Beatrice Girdler.*  Mrs. Girdler, who was 70 years old at the time of the accident

at issue, Trial Tr. 41:22-23, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52, testified

about her physical condition before her fall on October 3, 2008, her actions just before

and after she tripped and fell, her physical condition upon her return home to Washington

State, her medical condition requiring surgery, her pre-surgical pain and limitations, her

post-surgical pain and limitations and the effects of her injury upon her overall health and

well-being.

b.   *Plaintiff Ronald Girdler.*  Mr. Girdler testified about his wife's physical condition before

and after her fall on October 3, 2008, the post-incident events in the District of Columbia

and upon their return home to Washington State, his wife's pre-surgical pain and

---

[5] While the defendant submitted proposed findings with appropriate citations to the record of the trial proceedings, the plaintiffs' submission cited only the name of the witness whose testimony generally, according to the plaintiffs, supported their proposed finding.

limitations, her post-surgical pain and limitations, and the effects of her injury upon her overall health and well-being and her ability to perform household services.

c.   *Craig T. Arntz, M.D.*   Dr. Arntz is Mrs. Girdler's treating orthopedic surgeon in Washington State.  He appeared via videotaped deposition to testify about his physical examination of Mrs. Girdler, the surgery he identified as necessary to address her shoulder injury, the surgical procedure he performed, Mrs. Girdler's response to the surgery, his on-going treatment of Mrs. Girdler and her prognosis.

d.   *Lawrence Dinoff.*   Mr. Dinoff is an architect registered in multiple states, including Maryland, the District of Columbia and Virginia.  He has served as an American Institute of Architects Liaison Member to the American National Standards Institute and on a committee of the American Society of Testing and Materials.  From 1989 to the present, he has consulted for Robson Forensic, Inc., and provided reports and testimony concerning resolution of commercial and personal injury litigation.  Mr. Dinoff testified as an expert witness about the standard of care for safe walking surfaces, including sidewalks.  Based upon his review of deposition testimony, photographs of the sidewalk where Mrs. Girdler fell, and a visit to the site of the fall on December 8, 2010, he opined, within a reasonable degree of architectural certainty, that the defendant failed reasonably to maintain and warn of the tripping hazard on the sidewalk, in violation "of applicable standards for safe walkways and safe maintenance" and these failures were the "proximate cause of the sidewalk conditions that caused Mrs. Girdler's fall and injury." Dinoff Aff. ¶ 13(4).

e.   *Richard J. Lurito, Ph.D.*   Dr. Lurito has served as President and Senior Economist at Commonwealth Consulting Group since 1972.  He has over thirty years of professional

experience in the field of economics and has offered expert opinions on economic loss as a result of death, injury or discrimination in about eight hundred cases. Lurito Aff. Ex. 1 (Curriculum Vitae). Dr. Lurito testified, within a reasonable degree of economic certainty, that prior to her fall, Mrs. Girdler performed 30 to 32 hours per week of household services, which amount was reduced after her injury to 8 to 10 hours per week, resulting in a present value loss of $391,690 for the plaintiffs' loss of household services and replacement cost for those services. *Id.* ¶¶ 6, 9, 12.

f. *Mark Proctor*. At the time of Mrs. Girdler's fall in October, 2008, Mr. Proctor was the NASM Building Manager in charge of supervising the employees who maintain and inspect the sidewalks. Trial Tr. 61:2-21, July 9, 2012 P.M (Proctor), ECF No. 49. He was called by the plaintiffs as an adverse witness, *id.* 62:2-6, and testified about the maintenance of the sidewalks surrounding the NASM, including the frequency, regularity and standards for inspections for defects, at the premises of the NASM, and about his personal knowledge about the condition of the sidewalk at the time of Mrs. Girdler's fall.

### 2. Defendant's Witnesses

a. *Richard W. Barth, M.D.* Dr. Barth is a board certified orthopedic surgeon with a certificate of added qualification in surgery of the hand. Dr. Barth currently serves as Chief of Orthopedic Surgery at Sibley Memorial Hospital in Washington, D.C., as Director of the Orthopedic Surgery residency program for the George Washington University Orthopedic Residents at Sibley, and as Assistant Clinical Instructor in Orthopedic Surgery at George Washington University. His practice is almost exclusively devoted to the upper extremities, which includes the shoulder to the hand. Based upon his independent examination of Mrs. Girdler on December 14, 2011, Dr. Barth opined, to

a reasonable degree of medical certainty and based on his experience, training and expertise, that "while Mrs. Girdler sustained permanent disability with limited motion and weakness in her right shoulder, that injury is not to a degree and extent that would prevent her from performing routine household tasks such as vacuuming, cooking and laundry."  Barth Aff. ¶ 1.  He would "expect Mrs. Girdler to have difficulty with activities that require lifting above shoulder level and/or heavy lifting with the right arm, [but] would not expect her to have difficulty with activities that do not require lifting above the shoulder or heavy lifting with the right arm."  *Id.*

b.  *Anthony M. Dolhon, P.E.*  Mr. Dolhon is a Managing Engineer in the Buildings and Structures Practice at Exponent, Inc.  He trained as a structural engineer and has more than 28 years of experience, the last 22 years of which have focused on performance evaluations and diagnostics of buildings, civil engineered structures, structural components, and building materials.  He has been the lead investigator in a number of investigations regarding the determination of cause and origin of performance problems, extent of damage, identification of the mechanism of distress, standard of practice, compliance with applicable building codes, design of repairs, retrofits and code upgrades.  Based upon his review of deposition testimony, the plaintiffs' expert reports and other documents, photographs of the site, and a site visit on December 16, 2011, he testified, to a reasonable degree of engineering certainty, that "the subject sidewalk was not dangerously deteriorated and uneven at the time of Mrs. Girdler's fall; that there is no way of accurately opining how long the alleged defect was there; the subject sidewalk was not dangerous and need not have been repaired by the Smithsonian Institution before Mrs. Girdler fell; and that the Smithsonian properly maintained the subject sidewalk in

accordance with the applicable *International Property Maintenance Code.*"  Dolhon Aff.
¶¶ 1, 20, 21, 23.

c.  *Gloria J. Hurdle, Ph.D.*  Dr. Hurdle has been an economist for over 35 years and
currently serves as a Vice President at Economists, Incorporated, an economic consulting
firm, where she specializes in econometrics and industrial organization.  She has
provided expert economic analysis in a number of cases.  Prior to her current position,
Dr. Hurdle was an economist in the Antitrust Division of the United States Department of
Justice for thirteen years; before that, she served on the staff of the Subcommittee on
Antitrust and Monopoly of the United States Senate Committee on the Judiciary.  She
testified regarding her criticism of Dr. Lurito's calculation of economic damages and,
based upon her own analysis, concluded that the present value of the loss of household
services to the plaintiffs derived from Mrs. Girdler's fall on October 3, 2008 would
range, depending upon various factors, from $46,530 to $168,485.  Hurdle Aff. ¶ 38,
Table 1.[6]

d.  *Rahmat Muhammad, Ph.D.*  Dr. Muhammad is a Senior Scientist in the Human Factors
practices at Exponent, Inc., where she specializes in systems neuroscience, which is a
subdivision within the field of neuroscience concerned with the relationship between the
brain structure/function and cognitive and motor behaviors, such as learning and
memory, object perception, decision making and movement execution.  Muhammad Aff.
¶¶ 3, 4.  Dr. Muhammad analyzes the frequency and patterns of accidents associated with
a variety of products using large-scale databases available through the Food and Drug
Administration and the Consumer Product Safety Commission.  *Id.* ¶ 4.  Additionally, she

---

[6] Dr. Hurdle made clear that "If liability is not proven, then her damages are necessarily zero."  Hurdle Aff. ¶ 43.

has published papers and presented at conferences on topics related to human factors issues, including sensory and perceptual information processing and cognitive contribution toward maintaining balance to avoid falling.  *Id*. ¶ 5.  Dr. Muhammad testified that, in her opinion to a reasonable degree of scientific certainty, no additional mark or warning on the sidewalk where Mrs. Girdler fell would have made a difference because Mrs. Girdler was neither looking at nor attending to her path of travel.  *Id*. ¶ 1. She further opined that had Mrs. Girdler been looking at and attending to her path of travel, instead of the vendors along the side of the sidewalk, Mrs. Girdler would have detected the presence of the alleged irregular terrain as she approached it and she could have taken action to avoid it.  *Id*.

e.  *Nancy Bechtol*.  Ms. Bechtol has worked at the Smithsonian for twenty years and is currently the Director of the Office of Facilities Engineering and Operations.  Trial Tr. 147:14-25, July 11, 2012 A.M. (Bechtol), ECF No. 52.  In 2008, she served as the Director of the Office of Facilities Management and Reliability for the Smithsonian, a position that she held for eight years.  *Id*. 148:6-10.  She testified that Mrs. Girdler was the only person of whom she was aware who fell in 2008 on the 400 block of Independence Avenue.  She also testified about the systems in place at the Smithsonian for documenting visitor falls.  *Id.* 149:18-20.

### 3.  Credibility Assessment

a.  The majority of the witnesses who provided testimony during the bench trial were treating physicians of Mrs. Girdler and expert witnesses, and each generally testified credibly.  The only non-party fact witnesses to testify were Mr. Proctor and Ms. Bechtol

and they, too, presented the limited facts of which they were aware in a straightforward and careful manner.

b.  The plaintiffs appeared to be dissembling on certain points during their testimony both to counter the defense of contributory negligence and to support their damages claim by exacerbating Mrs. Girdler's physical limitations due to her shoulder condition and minimizing the effects of her other serious medical conditions.  For example, Mrs. Girdler admitted that she was distracted by and looking at merchandise being hawked by vendors parked along Independence Avenue adjacent to the NASM, but also emphasized how carefully she was watching her step.  Trial Tr. 16:20-21, July 10, 2012 P.M., ECF No. 50 (Mrs. Girdler testified: "I was just looking around, being a typical tourist, watching where I was going.  I was very careful."); *id*. 48:21-24 (Mrs. Girdler testified: "I used my peripheral vision.  I was aware of the people coming toward me, beside me.  I was a tourist.  I was carefully walking down the walk.").  Furthermore, Mrs. Girdler clearly understood the import of notations in her personal physician's records regarding her history of falling and deflected questions about this history by stating that she did not recall the details of past falls or re-characterizing a past fall as merely an instance where she "slipped."  *Id*. 60, 63-68 (Beatrice Girdler).  Both plaintiffs also indicated that Mrs. Girdler's long-standing lupus and other ailments did not impair her activities or cause her discomfort, even though her personal physician's records indicate to the contrary.  These areas of the plaintiffs' responses to questions raise some credibility concerns.

**B.    Mrs. Girdler's Fall During The Plaintiffs' Tourist Visit to Washington, D.C.**

1.  The plaintiffs, Beatrice and Ronald Girdler, reside in Auburn, Washington, and arrived in Washington, D.C. as tourists on September 30, 2008.  Trial Tr. 6:25–7:7, July 11, 2012 A.M.

(Ronald Girdler), ECF No. 52.  After several busy days touring the District of Columbia, *id.* 8:2-25, on October 3, 2008, at approximately 1:00 p.m., the plaintiffs walked westbound on the north-side public sidewalk in the 400 block of Independence Avenue, SW adjacent to the NASM.  *Id.* 9:6-13; *see also* Trial Tr. 40:15-25–41:1-2, July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50.  The weather that day was nice and clear.  *Id.* 41:15-20; *see also* Dolhon Report, Def.'s Ex. 18, at 2.  Already that morning, the plaintiffs had toured the Library of Congress, walked to the Russell Senate Office Building and then taken a tour of the Capitol Building, before walking from the Capitol Building to the NASM without stopping for lunch.  Trial Tr. 28:4-25–29:1-12, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52; *see also* Trial Tr. 15:4-18, 41:21-25–42:1-23, July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50.

2.  On October 3, 2008, and both before and after this date, vendors parked their trucks along the curb of Independence Avenue SE next to the NASM to sell their merchandise to tourists. Trial Tr. 9:14-24, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52; *id.* 149:21-25 (Nancy Bechtol); Trial Tr. 105:11-21, July 9, 2012 P.M. (Mark Proctor), ECF No. 49.  The vendor trucks "encroached on the sidewalk" by as much as seven feet.  Trial Tr. 9:14-17, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52.  The vendors are issued permits by the District of Columbia, not by the Smithsonian, which has no control over the vendors.  Trial Tr. 149:24-25–150:1-14, July 11, 2012 A.M. (Bechtol), ECF No. 52; *see also* Trial Tr. 105:11-21, July 9, 2012 P.M. (Proctor), ECF No. 49.

3.   The portion of the sidewalk adjacent to the NASM also has tree box spaces in which trees are planted.  When Mrs. Girdler was abreast of the vendor's truck nearest Tree No. 922, a vendor in the vehicle called out to her and waved merchandise to attract her attention.  Trial

Tr. 18:10-12, July 10, 2012 P.M., ECF No. 50 (Beatrice Girdler testified: "The vendor was calling out to me, yelling to me, shaking his little T-shirts and whatnot."); *id*. 21:6-12; Trial Tr. 9:23-24–10:1-3, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52.

4.  Mrs. Girdler testified about her response to the vendor and made clear that his efforts to attract her attention were successful.  She turned to walk towards the vendor who had called to her, enticed by the merchandise.  Trial Tr. 18:13-17, July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50.  She testified repeatedly that she was not looking ahead when she fell, that she was distracted, that she was looking away at the vending truck, and that she did not see the area of the sidewalk where she fell.  *See id*. 39:16-22 (Q. "Okay.  And when you made that move [toward the parked trailer], can you tell me, just before you were moving, where were you looking?"  Beatrice Girdler: "I believe I was just taking in everything, just looking around.  I was distracted by the fellows and went toward them."); *id*. 46:4-7 ("I was looking at my surroundings and the buildings and the people and the sidewalk and the trees, and I was just looking."); *id*. 51:8-12 (Q. "Why did you start to go towards the vendors?"  Beatrice Girdler: "Well, they were distracting me.  So I started to go toward them, and my right foot went into this depression, my right toe hit that ledge, and I fell.  I don't know how else to make it any clearer."); *id*. 51:22-24 ("I was just looking.  I saw T-shirts.  I was just looking at them.  I don't know whether I had any intention of buying anything or not.").

5.  As she moved towards the vendor's truck, Mrs. Girdler testified that her right foot stepped into a triangular depression formed in the corner where two sidewalk concrete slabs met and her right toe caught on the upraised vertical ledge of the corner of the SE flag.  *Id*. 21:13-23; 57:8-13.  As a result, she fell to the ground and her shoulder and arm were in "extreme pain." *Id*. 22:15-20.

6. Mr. Girdler testified that he did not see his wife fall, but determined that what caused his wife to fall was a "hole, a depression in the sidewalk," with a raised ledge.  Trial Tr. 10:11-15, 20-24, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52.  He did not see this depression in the sidewalk until after his wife had already fallen down and he had moved his wife "out of the way . . . kind of up that tree box area."  *Id*.; *see also id*. 30:21-22; 31:16-19; 34:20-22; 35:7-9.  While waiting for an ambulance, Mr. Girdler took two photographs of the area where he believed his wife had tripped, Plaintiffs' Exhibits 6 and 7 and Defendant's Exhibit 1 ("Mr. Girdler's Photographs").  Trial Tr. 13:3-8, 24-25; 33:20-23, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52.  He also measured the depth from the "highest apex of the ledge" to the dirt and determined the depth was "just below this top knuckle."  *Id*. 14:9-18.  On cross-examination, Mr. Girdler conceded that the area where he took the photographs was, as "best I could tell," the only broken place in the whole sidewalk.  *Id*. 35:1-3.

7. Mrs. Girdler testified that she did not see the depression in the sidewalk.  *See* Trial Tr. 39:16-22, July 10, 2012 P.M., ECF No. 50 (Q. "Did you see the ledge you tripped on before you tripped on it?"  A. "Oh, no.");  *id*. 45:23–46:5 (Q. "And you were pretty much looking straight ahead of you while you were approaching the entrance of the Air and Space Museum; is that correct?"  A. "I don't know if I was just looking ahead of me or if I was just looking."  Q. "Well, where were you looking?"  A. "I was looking at my surroundings and the buildings and the people and the sidewalk and the trees, and I was just looking.");  *id*. 48:21-24 ("I was just -- I was looking all around.  I used my peripheral vision.  I was aware of the people coming toward me, beside me.  I was a tourist.  I was carefully walking down the walk.");  *id*. 48:25–49:4 (Q. "Is there some point in time when you were looking straight ahead?"  A. "I can't answer that.  I don't know."  Q. "You don't know if you were looking

straight ahead?"  A. "I suppose at some time.  I'll say yes, you know . . ."); *id*. 51:25–52:5

(Q. "Now, when – before you turned your body, did you turn your head first?"  A. "I'm trying

to reenact this.  Did I turn my head before I turned my body?  Probably.  Maybe it was all at

the same time.  I just don't recall what part of my body I turned first.  I'm sorry."); *id*. 52:23–

53:5 (Q. "Now, you stated that as you approached the vendor trucks, you were relying on

your peripheral vision.  What did you mean by that?"  A. "Well, I could see out of the sides.

You know, you don't just look ahead, you do have peripheral vision.  I could see."  Q. "What

were you seeing out of the sides of your vision?"  A. "Just my total environment, what was

going on and where people were, where what was . . ."); *id*. 53:20-25 (Q. "And you state that

you did not see that triangular area that's shown in Plaintiff's Exhibit 16 prior to your fall?"

A. "No, I did not.  I wouldn't have fallen into it if I had seen it."  Q. "Why would that be?"

A. "Well, I would have sidestepped it.  I did not see it.").

### C.    Identified Risk Factors Contributing to Mrs. Girdler's Fall

8.   The defense witness, Rahmat Muhammad, Ph.D., a neuroscientist and expert in the field of

human factors, offered her expert opinion about the biomechanical, perceptual and cognitive

factors that influence the ability to maintain and recover balance during walking, as well as

risk communication and how people respond to warnings.  *See* Trial Tr. 108-109, July 11,

2012 A.M. (Muhammad), ECF No. 52; *see also* Muhammad Report, Def.'s Ex. 19, at 1;

Muhammad Aff.  ¶¶ 2, 5.

    a.   Dr. Muhammad testified that individuals scan their environment as they walk, in

       order to take in the information so that they can place their feet accordingly.  Trial Tr.

       110:3-5, July 11, 2012 A.M., ECF No. 52; Muhammad Report, Def.'s Ex. 19, at 3;

       Muhammad Aff.  ¶¶ 9-11.  She stated the obvious – that it is important for pedestrians

to look where they are walking – and also pointed out that reliance on peripheral vision may not be effective since central vision enables a person to see detail while peripheral vision loses the detail needed to see the environment.  Trial Tr. 111:25–112:4, 112:22-24, July 11, 2012 A.M., ECF No. 52.  She testified that the following cognitive factors affect an individual's ability to detect and appropriately respond to visual cues: (1) looking and (2) being attentive to what is there to be seen.  *Id.* 113:17–114:7; Muhammad Report, Def.'s Ex. 19, at 4; Muhammad Aff. ¶ 15.

b.  Dr. Muhammad identified certain risk factors that put a person at greater risk for falling, including: (1) the inherent variability built into our motor system; (2) divided attention; (3) age; (4) medical conditions; (5) medication usage; and (6) history of falling.  Trial Tr. 115-117, July 11, 2012 A.M., ECF No. 52; Muhammad Report, Def.'s Ex. 19, at 4; Muhammad Aff. ¶ 16.  According to Dr. Muhammad, these factors are also cited in a publication relied upon by the plaintiffs' expert, Mr. Dinoff, titled "Pedestrian Falling Accidents in Transit Terminals," which was published by the U.S. Department of Transportation Federal Transit Administration.  This publication concluded that "[i]n general, few transit passenger falls are caused by design or operating deficiencies.  The very low frequency of falling accidents . . . show that the majority of patron falling accidents are caused by behavior factors, preexisting medical conditions or personal actions of the victim, rather than the transit facility design or operation."  Trial Tr. 117:12-25, 119:19–120:20, July 11, 2012 A.M., ECF No. 52; Pls.' Ex. 57 (FED. TRANSIT AUTH., DEP'T OF TRANSP., No. UMTA-MA-06-0098-84-2, DOT-TSC-UMTA-84-36, PEDESTRIAN FALLING ACCIDENTS IN TRANSIT TERMINALS 42 (1985)).

c.   Dr. Muhammad identified a number of environmental cues available to Mrs. Girdler, had she been alert and attentive as she walked at the time of her fall, including the features of the defective area, such as (1) the alleged raised edge; (2) the color contrast between the ground underneath and the flooring on top; and (3) the shape of the area, all of which the visual system can easily detect and resolve.  Trial Tr. 118:2– 119:8, July 11, 2012 A.M., ECF No. 52; Muhammad Report, Def.'s Ex. 19, at 5-6; Muhammad Aff. ¶¶ 17-19.  Dr. Muhammad pointed out that where, as here, a raised ledge is parallel to a pedestrian's path of travel, that does not make the ledge less visible, because the visual system resolves height differences by comparing the side-by-side height of the ledges, whether they are vertical or horizontal.  Trial Tr. 121:2-16, July 11, 2012 A.M., ECF No. 52.

d.   Dr. Muhammad found the presence of several risk factors related to Mrs. Girdler's fall: (1) Mrs. Girdler's attention and gaze were turned toward the vendor at the time her foot allegedly made contact with the ledge; (2) Mrs. Girdler's history of falls; (3) Mrs. Girdler's age; and (4) Mrs. Girdler's medical conditions.  *Id*. 121:17–122:16; Muhammad Report, Def.'s Ex. 19, at 6-7; Muhammad Aff. ¶¶ 23-27.

e.   Regarding the presence of vendors parked along Independence Avenue, Dr. Muhammad testified that based on her expertise and experience, she would not expect such vendors to create difficulty for people walking on the sidewalk near the 400 block of Independence Avenue because a reasonably attentive pedestrian could take in the vendors and, at the same time, if the pedestrian were paying attention, scan the path of travel, or stop and attend to the vendors and then attend to her walking path, or slow down.  Trial Tr. 122-123, July 11, 2012 A.M., ECF No. 52.  Dr. Muhammad

considered "significant" that nine feet of walking space was available on the sidewalk, which gave Mrs. Girdler options and, had she been looking at and navigating her path of travel, Mrs. Girdler could have sidestepped the allegedly defective area. *Id.* 126:5-22; *see also* Trial Tr. 53:20-25, July 10, 2012 P.M., ECF No. 50 (Mrs. Girdler's Testimony that "Well, I would have sidestepped it. I did not see it."). Moreover, the depression in the sidewalk was not hidden and contained features that were evident to the visual system, such as contrast features, height features, and three-dimensional features. *See* Trial Tr. 125:6-12, July 11, 2012 A.M. (Muhammad), ECF No. 52; Muhammad Report, Def.'s Ex. 19, at 5-6; Muhammad Aff. ¶¶ 17-20.

f.   Regarding the possibility of warnings to pedestrians about the depression in the sidewalk where Mrs. Girdler fell, Dr. Muhammad testified that a marking on that area of the sidewalk would not have called Mrs. Girdler's attention to the area for two reasons: First, because Mrs. Girdler was looking at and attending to the vendors, and, second, because the feature that is important is height, and a color marking would not have provided information about the relevant feature, i.e., height. Trial Tr. 125:12-25, July 11, 2012 A.M., ECF No. 52; Muhammad Report, Def.'s Ex. 19, at 7; Muhammad Aff. ¶¶ 28-30. In fact, Dr. Muhammad testified that there are times when markings on a sidewalk might be inappropriate, because there is no universal sign for a sidewalk defect, and even if a pedestrian sees a marking, it may not convey any information. If markings were applied to all kinds of cracks in the sidewalk, a person may either just ignore them or focus on them to the exclusion of other things to which they should also be paying attention. Finally, markings could be

inappropriate if they hide the feature that you are in fact trying to warn about, such as a height difference.  In other words, markings can actually take away from a person's ability to detect and visualize the relevant details that they need to respond to.  Trial Tr. 126:23–129:3, July 11, 2012 A.M. (Muhammad), ECF No. 52.

g.  In sum, Dr. Muhammad opined, based on her experience and training and to a reasonable degree of scientific certainty: (1) had Mrs. Girdler been looking at and attending to her path of travel, she would have been able to avoid this area of the sidewalk; and (2) that no additional mark or warning would have made a difference in this area of the sidewalk, as Mrs. Girdler was not looking at or attending to her path of travel.  *See* Trial Tr. 124:23–125:5, July 11, 2012 A.M., ECF No. 52; Muhammad Report, Def.'s Ex. 19, at 7; Muhammad Aff. ¶¶ 31, 32.

9.  A second defense witness, Dr. Barth, testified as a medical expert about a history of falling, which is one of the risk factors identified by Dr. Muhammad.  Dr. Barth opined that, based on his experience, training, and expertise, a person with a history of falls is more likely to fall.  Trial Tr. 127:11-23, July 9, 2012 P.M., ECF No. 49 (Q. "Yeah, I mean, did you go online and start looking at Medline or PubMed or any of these things to look up falling incidents?"  Dr. Barth A. "I'm an orthopedic surgeon.  Every day I see somebody who fell, and the people that I see who frequently fall are more likely to fall.  I don't really have any specific reference, but I'm sure I could come up with one."  Q. "But you didn't do one before you put your affidavit together; did you?"  A. "This is something I see every day, and I'm fairly – I'm very comfortable giving an opinion that people who fall more are more likely to fall down and break things.  We see it all the time, every day."); *see also* Barth Aff. ¶ 23.

10.  Dr. Barth further opined, based upon his review of the deposition of Mrs. Girdler's treating

physician, Dr. Richard A. Neiman, that "Mrs. Girdler had a history of falling both before the injury occurred and also falling after the injury occurred," and "someone who has a history of falling is obviously more likely to fall and injure themselves." Trial Tr. 110:15-16; 116:6-18, July 9, 2012 P.M., ECF No. 49.

11. Mrs. Girdler's treating physician, Richard A. Neiman, M.D., did not testify at the bench trial but designated portions of testimony that he gave at a deposition were admitted into evidence over objection.[7] Dr. Neiman has been treating Mrs. Girdler for "close to 20 years" for "lots of medical problems" that are "ongoing." Deposition of Richard A. Neiman, M.D., June 19, 2012 ("Neiman Dep.") 12:18-24, 14:8. Dr. Neiman commented upon review of his records from before October, 2008, that Mrs. Girdler "never feels well," "has lots of different areas of pain," and has "generally felt poorly the past 20 years." *Id*. 15:24, 27:24, 103:15-16. Significantly, Mrs. Girdler has told Dr. Neiman, as reflected in his records for April 18, 2007, that she "falls a lot," *id*. 21:12-25–22:9, and his records for March 7, 2012 also indicate

---

[7] Although the defendant designated portions of Dr. Neiman's deposition and related medical records before trial, and posed questions to a number of witnesses, including medical experts and the plaintiffs, predicated on this evidence, the government failed to move for the admission of the designated portions of Dr. Neiman's deposition and medical records during trial. Following trial, the government requested that "those portions of Dr. Neiman's deposition as designated by Defendant" be "admitted in evidence," explaining that "[w]hile it was believed that the designated portions of the Neiman deposition were admitted in evidence at trial, a search of the trial transcripts and exhibits reveal that an oversight occurred and these designations may not have been formally admitted." Parties' Joint Submission in Response to the Court's Order Dated January 22, 2013 ("Joint Submission"), ECF No. 55 at 2. The plaintiffs object to the admission of this evidence because this "would impermissibly invite the fact finder to interpret scientific records without the reliable guidance of a medical expert's testimony," and this evidence is "irrelevant." *Id*. at 3-4. The Court overrules the plaintiffs' objection, and will allow into evidence the designations of Dr. Neiman's deposition and medical records. *See* Defendant's Designations of Depositions of Dr. Craig T. Arntz and Dr. Richard A. Neiman, ECF No. 44 at 1-3. In so doing, the Court recognizes that a trial record may be reopened "to permit the introduction of additional evidence" when, *inter alia*, "(1) the evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is bona fide; and (3) reopening will cause no undue prejudice to the non-moving party." *Davignon v. Hodgson*, 524 F.3d 91, 113-114 (1st Cir. 2008) (citations and internal quotation marks omitted); *see also Levy v. Lexington County, S.C.*, 589 F.3d 708, 714 (4th Cir. 2009); *Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1285 (10th Cir. 1994). Here, consideration of these factors militates in favor of admission of the designated portions of Dr. Neiman's deposition and related medical records, which were not introduced during trial due to an "oversight." Joint Submission at 2. This evidence relates to Mrs. Girdler's medical treatment by her primary care physician for over 20 years and, thus, is highly probative. Finally, allowing the government to cure its inadvertent error will cause minimal prejudice to the plaintiff as the defendant's expert, Dr. Barth, relied on Dr. Neiman's medical records related to the plaintiff's history of falling, and the Court has already allowed that testimony into evidence during the bench trial. Trial Tr. 12:23–13:22, July 10, 2012 A.M., ECF No. 53.

that Mrs. Girdler reported falling.  *Id.* 78:21-25.  On cross-examination, Mrs. Girdler was

queried about the falls reported in her medical records on November 13, 2007 and March 7,

2012, but she did not recall the 2007 incident and characterized the 2012 incident as an

instance when she "slipped."  Trial Tr. 59:5-17; 60:4-14 ("I did not fall, but I slipped in a

parking lot"), July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50.

### D.      The Condition of the Sidewalk

1.  The sidewalk where Mrs. Girdler fell is made of concrete sections, called flags, that are

divided by longitudinal and transverse expansion joints, with the edges of each flag

rounded off to form a half-inch radius finish.  Trial Tr. 28:16-18; 30:11-15, 33:1-4, July 9,

2012 P.M. (Dinoff), ECF No. 49.  A single longitudinal expansion joint extends, east-

west, the length of the sidewalk from its midpoint to divide the sixteen-foot wide

sidewalk into an eight-foot wide north side and an eight-foot wide southside.  Dolhon Aff.

¶ 12.  The transverse expansion joints, which run north-south, are spaced at about 12 to

15 feet wide distances, at right angles to Independence Avenue over the length of the

sidewalk.  *Id.*  Although the "width of the usable sidewalk" measures 15 feet, 10 inches

between the face of the retaining wall and the curb, when the defense expert visited the

site on December 16, 2011, he observed that the tree planter at Tree No. 922 and the

overhead canopies of the truck vendors made the "least width of usable sidewalk

measure[] approximately 9 feet wide."  Dolhon Aff.  ¶ 13; *see also* Trial Tr. 73:23–75:8,

July 11, 2012 A.M. (Dolhon), ECF No. 52.  A patched area of the sidewalk measured

approximately 13 by 11 inches.  Dolhon Aff. ¶ 7.

2.  On October 3, 2008, a corner of a northeast (NE) flag at the intersection of the longitudinal

and transverse expansion joints nearest Tree No. 922 had eroded to form a defect.  The defect

appeared as a small island of concrete sidewalk surrounded on three sides by a triangular outline of dirt, where the sidewalk had been slightly worn or chipped away.  The longitudinal joint comprised one side of the defect and transverse joint another side of the defect, with the third side a craggy line of dirt where concrete had once been.  The corner of the SE flag was slightly raised above the broken corner of the NE flag and exposed a vertical ledge that extended east-west along the longitudinal expansion joint and was parallel to pedestrian travel of the sidewalk.  Exs. 6, 7, and 11.[8]

3.  Mr. Dinoff, the plaintiffs' expert witness, examined Mr. Girdler's photograph, Exhibit 6, and opined that the depression in the sidewalk was greater than one inch, stating: "at the time this photo was taken the differentiation was apparently twice the half inch based on what I see here [looking at the photo]. . . . So it's at least an inch; and by my measurements, it was closer to an inch and three-eighths, inch and a quarter."  Trial Tr. 32:1-7, July 9, 2012 P.M. (Dinoff), ECF No. 49.  He subsequently noted that "It is very hard to measure a weathered sidewalk and say exactly what it is.  I'm able to say that it's in that range of half an inch, but because of the weathered joint, … it's three-eighths here, half an inch there."  *Id.* 32:15-18.

4.  Mr. Dinoff also visited the site of Mrs. Girdler's fall, on December 8, 2010, over two years after the date of the fall.  Using a caliper, he measured where a patch was missing "the

---

[8] The parties presented expert opinion speculating on the cause of the depression in the sidewalk corner, including tree root growth below the slab, "freeze thaw," and "frost heave" from water accumulating under the concrete, freezing and then expanding to displace the sidewalk upwardly.  Dinoff Aff. ¶ 6; Dolhon Aff. ¶ 8.  This speculation was designed to show that the sidewalk depression had been in existence a sufficient period of time to have been noticed upon inspection by the defendant.  *See* Dinoff Aff. ¶ 6 ("The upraised tripledge . . . existed for an unreasonably lengthy period of time and should have been discovered by reasonable inspections and eliminated.").  The Court has no doubt that the condition of the sidewalk did not materialize overnight but had existed for some time.  Nevertheless, the length of time the sidewalk condition existed begs the crucial question of whether the condition presented a hazard requiring attention and, on that question, the plaintiffs cannot prevail.  *See District of Columbia v. Freeman*, 477 A.2d 713, 718-19 (D.C. 1984) ("The existence of prior notice" is not enough, however; a plaintiff must demonstrate that the street is "in fact unreasonably dangerous.").

difference . . . between the height of the southeast flag and the height of the southwest flag in the area where Ms. Girdler fell" and determined the difference "was on the order of one and three-eighths inch." *Id*. 52:9-18.  Mr. Dinoff conceded that "[i]t is very hard to measure a weathered sidewalk and say exactly what it is," and he further observed that the measurements vary in different locations of the depression.  *Id*. 32:14-18.  Notwithstanding the variation in results depending upon the precise location where the measurement was taken, and the undisputed facts that two years had elapsed and patch work had been performed between the time of the fall and the time the measurements were made, the plaintiffs relied heavily on Mr. Dinoff's measurement of one and three-eighths inch as the estimate of the extent of unevenness between the height of the southeast and southwest flags in the disputed area of the sidewalk.  *Id*. 28:4-14.

5.   The defense expert witness, Mr. Dolhon, testified that there is no way to reliably measure the difference between the horizontal plane of the high slab and the horizontal plane of the lower slab by looking at a photograph.  Trial Tr. 72:7-11, July 11, 2012 A.M., ECF No. 52.  Furthermore, this defense expert questioned the reliability of Mr. Dinoff's 2010 measurements since the sidewalk had been subject to mortar patch repairs by the time that Mr. Dinoff took his measurements and, over the course of two years, the sidewalk had also been subject to potential freeze thaw action, tree root growth, and seasonal changes, all of which indicates that the condition of the sidewalk in 2010 was not the same as at the time of Mrs. Girdler's incident.  Dolhon Aff. ¶ 7.

6.   Significantly, Mrs. Girdler fell while turning left, from west to south, towards the vendors parked with their merchandise on the south-side of the sidewalk, and, according to her testimony, putting her right foot in the depressed area of the NE flag, thereby tripping on

the raised edge of the SE flag.  Mr. Dinoff's measurement of one and three-eighths inch

between the height of the southeast flag and the height of the southwest flag, *see* Trial Tr.

52:16-18, July 9, 2012 P.M., ECF No. 49, does not appear to be the "raised ledge" that

Mrs. Girdler indicated caused her to trip.  Thus, his measurement of one and three-eighths

inch appears to be of little relevance.

7.  Moreover, the defense witness, Mr. Dolhon, opined that taking a measurement from the

height of the soil to the highest point on the slab – as Mr. Girdler measured with his

finger and Mr. Dinoff measured by reviewing Mr. Girdler's photographs – is not reliable,

or accurate in evaluating whether there is a tripping condition, because the soil inside the

joint would not necessarily be representative of where the shoe bottom would be placed.

Trial Tr. 69:11–70:6, July 11, 2012 A.M., ECF No. 52; *see also id.* 71:11–72:6 (Mr.

Dolhon's testimony that it is deceptive to imply that Mr. Dinoff's measurements were to

the degree of accuracy a caliper provides, and unfair to measure the depth of the hole as

opposed to the relative difference between the higher and lower slab where the shoe

bottom would be placed).  According to Mr. Dolhon, the more accurate measurement is

where the bottom of the foot is, i.e., the horizontal plane of the lower slab, which in this

case is the triangular piece of concrete in the corner of the northeast flag, relative to the

horizontal plane of the SE flag.  *Id.* 67:7–68:13.

8.  Mark Proctor, the Building Manager of the NASM, provides important corroboration of

Mr. Dolhon's point concerning the contours of the depression in the sidewalk at issue.

Due to his position and responsibilities, Mr. Proctor has the benefit of regularly walking

and inspecting the sidewalk around the NASM.  He testified that based upon his

examination of the area of Mrs. Girdler's fall in October, 2008, "The triangular area there

that is the subject of the trial, it was at that time, when I saw it, it had concrete in it."
Trial Tr. 95:9-10, July 9, 2012 P.M. (Proctor), ECF No. 49; *see also id*. 94:14 ("There's a
large piece of concrete in the hole here").  Mr. Proctor noted that this observation is
confirmed by examination of Mr. Girdler's photograph, Pls.' Ex. 6, stating: "I'm saying,
looking at the picture, to me, it appears that if you look at the picture, the -- . . . the
plaintiff took, there's a triangular piece of concrete in that triangular hole."  Trial Tr.
95:17-21, July 9, 2012 P.M. (Proctor), ECF No. 49.  In comparing Mr. Girdler's
photograph, Pls.' Ex. 6, and photographs taken two weeks later, on October 16, 2008, by
Mr. Proctor's staff, to photographs taken subsequently of the same sidewalk area, Mr.
Proctor observed that "Subsequent pictures, it looked like a lot of it [referring to the
concrete] has been moved out and the hole appears to be larger."  Trial Tr. 95:24-25, July
9, 2012 P.M. (Proctor), ECF No. 49; *see also id*. 54:14-16 (in reviewing a photograph
marked for identification, Mr. Proctor testified: "There's a large piece of concrete in the
hole here, it does not appear to be, but there are other pictures, I guess, that you can see
that more plainly.").  If a portion of the concrete in the center of the triangular area were
removed, Mr. Proctor confirmed that the vertical ledge that was exposed would be higher
than it was on October 3, 2008. *Id*. 96:1-6.  While no specific testimony was presented
about the process of preparing a sidewalk for a mortar patch, the parties do not dispute
that a mortar patch was in place at the time of the 2010 visit by the plaintiffs' expert.

### E.    Maintenance of the NASM Sidewalk

1.  There is no dispute that maintenance of the public sidewalk in the 400 block of Independence
    Avenue SW next to the NASM is the responsibility of the Smithsonian.  Trial Tr. 101:3-7,
    July 9, 2012 P.M. (Proctor), ECF No. 49.

2.  Nancy Bechtol, who served in 2008 as the director of the Smithsonian's Office of Facilities Management and Reliability, testified that, in 2008, there were over 7 million visitors to the NASM, which is among the top three most visited museums in the world.  Trial Tr. 149:1-13, July 11, 2012 A.M., ECF No. 52.  Both Ms. Bechtol and Mark Proctor, the Building Manager of the NASM, testified that the Smithsonian takes safety "very seriously" and, notably, that Mrs. Girdler was the only person of whom they were aware who fell on the 400 block of Independence Avenue in 2008 and thereafter.  *Id.* 149:18-20; 150:20-24 (Bechtol); Trial Tr. 62:8-14; 79:23-24; 100:5-14, July 9, 2012 P.M. (Proctor), ECF No. 49.

3.  The sidewalks surrounding the NASM are inspected on a regular and frequent basis. Specifically, (1) on a daily basis, NASM Office of Protective Service ("OPS") and/or Office of Facilities Management and Reliability ("OFMR") staff "walk a full circuit around the NASM inspecting sidewalks for blemishes in the walking surface, anomalies in ground levels and general safety issues;" (2) on at least a weekly basis, NASM Office of Health and Safety ("OHS") conducts an inspection; and (3) at least once per year, the Smithsonian Office of Safety, Health, and Environmental Management ("OSHEM") inspects the museum grounds, including sidewalks, and provides a report, known as the Management Evaluation and Technical Review ("METR").  Dolhon Report, Def.'s Ex. 18, at 3-4 (quoting Def.'s response, dated July 29, 2011, to Request No. 5(c) in Pls.' First Set of Interrogatories); Trial Tr. 84:4-14; 85:7-24; 86:1; 101:8-25; 102:1-9, July 9, 2012 P.M. (Proctor), ECF No. 49.  "No sidewalk issues" were noted in the METR reports from 2008 to the present.  Dolhon Report, Def.'s Ex. 18, at 3-4; Trial Tr. 102:1-9, July 9, 2012 P.M. (Proctor), ECF No. 49.

4.  Building Service Workers ("BSWs"), who are the custodial employees of the Smithsonian and supervised by Mr. Proctor, walk around the building at least once, if not more times,

daily, performing various custodial-related tasks as well as determining if there were any tripping hazards on the sidewalk, and Mr. Proctor regularly accompanied them. *Id.* 67:3-7; 68:8-14; 84:4-14. Mr. Proctor testified that during his inspections, he observed cracks in the sidewalk, including around Tree No. 922. *Id.* 67:8-20; 82:4-7.

5. During the August 2008 METR inspection, or other inspections, Mr. Proctor did not notice the depression in the sidewalk around Tree No. 922 because it was small and not a hazard given the width of the sidewalk and amount of usable pedestrian walkway. *Id.* 97:6-15; 102:2-12; 103:1-9. He states that "this anomaly is one small little portion of that 10-foot clearance." *Id.* 77:3-4; *see also id.* 94:18 ("But on the 3rd, this was a very small anomaly"). Thus, even with the area depicted in Mr. Girdler's photograph, Pls.'s Ex. 6, Mr. Proctor considers the sidewalk to be "a serviceable sidewalk." Trial Tr. 103:8-9, July 9, 2012 P.M. (Proctor), ECF No. 49.

6. Mr. Dolhon similarly testified that the raised edge and/or depression in the sidewalk identified by the plaintiffs on October 3, 2008 is a relatively small and isolated condition within a 9 foot wide sidewalk that did not impede the use of that sidewalk. Trial Tr. 79:7-14, July 11, 2012 A.M., ECF No. 52; Dolhon Aff. ¶ 5.

     **F.    Mrs. Girdler's Injury and Medical Treatment**

1. Prior to her fall on October 3, 2008, Mrs. Girdler suffered from a number of serious medical conditions, including lupus (requiring regular use of Prednisone), sleep apnea, a history of falling, chronic pain and fatigue, likely fibromyalgia, and active lung disease (pulmonary fibrosis). *See* Neiman Dep. 12:18-24; 13:2-8; 21:25; *see also* Trial Tr. 12:9-19; 58:17-18; 59:1-5; 62:17-23, July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50; *see also id.* 69:7-18 (Q. "Dr. Neiman has documented that in January, March, May, July and August of 2008 that you

came to him complaining of aches and pains all over, pains around the ribcage, pains in lots

of different areas, fibromyalgia, fingers thick and swollen and painful, gastrointestinal,

stomach problems, right hip pain, bad fatigue – all of those things Dr. Neiman documented in

his medical records.  You don't have any argument with that; do you?"  A. "No, I'm not

arguing with my doctor.").  According to Mr. Girdler, his wife was diagnosed with lupus

shortly after they were married in 1988, and "lupus is a debilitating disease because it incur a

lot of pain and everything [sic]."  Trial Tr. 3:22-23, 5:17-19, July 11, 2012 A.M. (Ronald

Girdler), ECF No. 52.  Mrs. Girdler nevertheless denied that lupus impaired her ability "to do

home activities."  Trial Tr. 12:12-14, July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50.

2.   Notwithstanding these conditions, the plaintiffs testified that Mrs. Girdler enjoyed an active,

independent lifestyle that included performing her own activities of daily living, such as

driving an automobile, and that she had sufficient strength, pain-free motion and self-esteem

to perform approximately 30-32 hours per week of house work involving reasonably heavy

lifting with both hands, as well as overhead tasks requiring reasonable twisting strength with

her right arm.  Trial Tr. 6:6-19, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52.

3.   The medical experts agree that the October 3, 2008 fall caused a comminuted fracture-

dislocation of the humeral head from the socket of Mrs. Girdler's right shoulder and a tear

of the rotator cuff ligaments that facilitate arm strength and movement of Mrs. Girdler's

right arm.  Trial Tr. 110:20-25, July 9, 2012 P.M. (Barth), ECF No. 49; Barth Aff. ¶ 5;

Videotaped Deposition of Craig T. Arntz, M.D., June 18, 2012, Pls.' Ex. 66 ("Arntz

Dep."), 10:7-17; 54:20-22; 55:1-9.  These conditions necessitated surgery on Mrs. Girdler's

shoulder on October 17, 2008 and the post-operative care that followed.  Trial Tr. 110:20-

25, July 9, 2012 P.M. (Barth), ECF No. 49; Barth Aff. ¶ 5; Arntz Dep. 17:5-13; 18:6; 26-36.

4. Mrs. Girdler has a persistent right rotator cuff tear, despite medically appropriate care and treatment. Barth Aff. ¶ 19; Arntz Dep. 85:13-16. She has a permanent injury to her right shoulder that limits the motion of and produces weakness in her right shoulder. Trial Tr. 111:3-10; 112:7-15, July 9, 2012 P.M. (Barth), ECF No. 49; Barth Aff. ¶ 19; Arntz Dep. 43:8-21; 47:13-17; 53:18-21.

5. Dr. Craig Arntz, who performed Mrs. Girdler's shoulder surgery, testified that, despite her shoulder condition, Mrs. Girdler should be capable of tolerating most activities that require use of her arms below the chest level, and even activities such as lifting a small suitcase, but that activities that require use of the arms overhead would cause problems. Arntz Dep. 68:22–69:16; *see also* Arntz Dep. 61:1-9 (confirming notation in record of January 12, 2009 that Mrs. Girdler reports that "she is now back performing the majority of her daily activities without significant limitation"); Neiman Dep. 104:19-22. The defense expert, Dr. Richard W. Barth, also testified that based on his treatment of thousands of patients with rotator cuff injuries, and his review of the medical records and his examination of Mrs. Girdler, he would expect Mrs. Girdler to be able to perform activities at or below chest level, including vacuuming, cooking, and laundry, even with her injury. *See* Trial Tr. 113:19–115:13, July 9, 2012 P.M., ECF No. 49; Barth Aff. ¶¶ 22, 24. Indeed, Mrs. Girdler confirmed that she can put away some of the groceries (bread, soup, milk, produce, eggs) and put dishes from the sink to the dishwasher, for example. Trial Tr. 72:4–73:7, July 10, 2012 P.M., ECF No. 50. She also testified (and demonstrated) that she can lift her arm to chest level. *Id*. 76:3-8.

6. Both Dr. Barth and Dr. Arntz testified that Mrs. Girdler's rotator cuff tear is very small, and Dr. Barth indicated that these types of tears are very common in people in their seventies (30 to 40 percent of that population). Trial Tr. 115:20-25; 121:13-20, July 9, 2012 P.M. (Barth),

ECF No. 49; Barth Aff. ¶ 20; Arntz Dep. 72:19–73:21.

7.  Dr. Barth provided troubling testimony that, based on his examination, there was evidence

that Mrs. Girdler was overstating the extent of her motion and pain in her right arm.  Trial Tr.

111:3-10, July 9, 2012 P.M., ECF No. 49 (Dr. Barth testified: "I felt that some of her limited

motion was volitional; and by that, I mean she wasn't trying as hard because her passive

motion was much better than her active motion, and in reviewing the records, there was some

other discrepancies in her motion, and I felt that she had had an injury and had some

permanent restrictions."); *see also id*. 113:1-16 ("[S]he would actively lift her arm to 90

degrees, which is about to this level, and then gently I lifted her to 120 degrees, and then I let

go and she was able to maintain it there and let it down slowly . . . . [T]his means that she

was able to hold her arm at 120 degrees and control the lowering of her arm, which would

indicate that she had more mobility and less pain above 100 degrees than she was reporting.

So what I mean by that is that there was some volitional diminished motion."); Barth Aff. ¶

13.  Dr. Barth concluded that Mrs. Girdler has about a twenty percent loss of strength in her

right arm.  Trial Tr. 112:16, July 9, 2012 P.M., ECF No. 49; Barth Aff. ¶ 14.

8.  Dr. Arntz, Mrs. Girdler's treating physician, corroborated the findings by the defense expert,

stating that during his examination on January 12, 2009, Mrs. Girdler was able to actively

elevate her arm up to 160 degrees, and on March 2, 2009 to 155 degrees, which is within 20

to 25 degrees of the normal range of full elevation at 175 degrees.  Arntz Dep. 33:5-12; 61:1-

15; 63:3-14.  With assistance "she can move even farther."  *Id*. 33:10-12.  During his more

recent examination, on February 27, 2012, Mrs. Girdler's shoulder motion elevation ranged

to about 90 degrees and, with assistance, she tolerated about 125 degrees, which Dr. Arntz

agreed was consistent with Dr. Barth's finding.  *Id*. 52:2-20.

### G.     Damages and Loss of Household Services

1.  The plaintiffs claim that Mrs. Girdler incurred $42,694.39 in bills attributable to her medical care and treatment stemming from her fall on October 3, 2008.  Trial Tr. 38:1-4, July 10, 2012 P.M., ECF No. 50; Pls.' Ex. 64.

2.  As a result of the injury to her right arm and shoulder, Mrs. Girdler testified that she is unable to raise her arm above chest level to clean windows, vacuum, iron, lift heavy objects over five to ten pounds, or drive.  Trial Tr. 32:19; 36:1-5; 37:7-13; 72:4-15; 76:3-8, July 10, 2012 P.M. (Beatrice Girdler), ECF No. 50.

3.  Because of the limitation in the movement of her arm, the plaintiffs claim that Mrs. Girdler is able to perform approximately 8-10 hours of household services at the plaintiffs' residence, which the plaintiffs describe as a "reduced" amount.  Lurito Aff. ¶ 9.  Mr. Girdler performs approximately 20 hours of the regular and necessary household services of the Girdler home.  Trial Tr. 21:16, July 11, 2012 A.M. (Ronald Girdler), ECF No. 52; Lurito Aff. ¶ 9.

4.  The plaintiffs offered the testimony of Dr. Lurito, an economic expert, who estimated that the loss of future household services from Mrs. Girdler's injury would be $391,690, Lurito Aff. ¶¶ 6, 9, 12, Trial Tr. 29:21-24, July 10, 2012 A.M. (Lurito), ECF No. 53, an amount disputed by the defendant, see Hurdle Aff. ¶¶ 8-37.[9]

---

[9] Both the plaintiffs and the defendant's economic experts agreed that the period of 16 years was the appropriate duration for computing the loss of the approximate replacement cost of household services that resulted from Mrs. Girdler's injury, and estimated hours per week.  Dr. Lurito used the rate of $20.00 per hour, which had been paid by the plaintiffs to a local housekeeping service, with a 4.0% escalation factor, based on the average of the historical rate of increase for such workers, and a discount rate of 2.5% based on the average of current Treasury bond yields.  Trial Tr. 24:12-15, 25:22-24, 26:1-8, 27:18-25, 28:1-6, July 10, 2012 A.M. (Lurito), ECF No. 53.  The defendant disputes the damage estimate, asserting that "Dr. Lurito overestimated the number of hours that [the p]laintiffs claim Mrs. Girdler cannot perform household activities, the growth rate he used is too high and is based on a wage rate for first line supervisors of housekeeping and janitorial workers, the hourly rate of $20 per hour is too high and is not

5. Finally, the plaintiffs sought damages for past, present and future pain and suffering, due in part to the fact that Mrs. Girdler has declined to pursue further surgical options, and thus the small rotator cuff tear will be with her the remainder of her life.[10]

## III. CONCLUSIONS OF LAW

In reaching the conclusions of law, the Court evaluates the evidence to determine whether the plaintiffs have established each element of the two claims in the Complaint for negligence and loss of consortium by a preponderance of the evidence. *See Clark v. Feder Semo & Bard, P.C.*, No. 07-cv-470, 2012 U.S. Dist. LEXIS 114637, at *63 (D.D.C. Aug. 15, 2012) ("The Court reviews the evidence under the 'default rule for civil cases,' the 'preponderance of the evidence' standard.") (citing *Cigna Corp. v. Amara*, 131 S. Ct. 1866, 1881 (2011)); *see also Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Svc.*, Nos. 00-cv-2089 and 00-cv-1401, 2012 U.S. Dist. LEXIS 113808, at *59-60 (D.D.C. Aug. 14, 2012). The defendant bears the same burden of proof to establish any affirmative defense for contributory negligence on the part of Mrs. Girdler.

### A.     The Applicable Legal Standards

#### 1.     The Federal Tort Claims Act

The United States, as a sovereign, is absolutely immune from suit and, unless Congress has unequivocally consented to permit a cause of action, no court has jurisdiction to entertain a claim against the United States. *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941); *United*

---

based on any independent analysis – instead it is based on one housekeeping service the Girdlers had used in the past – and the calculation is after taxes, does not include a tax rate, and includes prejudgment interest not available in an FTCA case." Def.'s Findings & Conclusions ¶ 76 (citing Trial Tr. 50:19–52:20, July 10, 2012 A.M. (Lurito); Hurdle Aff.).

[10] In determining the amount of damages warranted for Mrs. Girdler's pain and suffering, the plaintiffs suggest that the Court consider the following factors: "(1) the extent and duration of any physical injuries sustained by Mrs. Girdler; (2) the effects that these physical injuries had on her overall physical and emotional well-being; (3) any physical pain and emotional distress that Mrs. Girdler suffered in the past; (4) any physical pain and emotional distress that Mrs. Girdler will likely suffer in the future; (5) any disfigurement or deformity suffered by Mrs. Girdler; (6) any inconvenience Mrs. Girdler has experienced; (7) any inconvenience Mrs. Girdler will likely experience in the future; and (8) any medical expenses incurred by Mrs. Girdler. Pls.' Findings & Conclusions at 22-23 (citing D.C. Standardized Jury Instruction § 13.01).

*States v. Testan*, 424 U.S. 392, 399 (1976).  Congress created a limited waiver of sovereign immunity of the United States by enacting the Federal Tort Claims Act and its provisions, therefore, must be strictly construed in favor of the United States.  *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *United States v. Kubrick*, 444 U.S. 111, 118 (1979); *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) ("*Tri-State*").

The FTCA creates liability for certain torts committed by agencies of the United States or their employees.  *See* 28 U.S.C. § 1346(b)(1).  While the Smithsonian is not an executive branch agency, it is an independent establishment of the United States, and therefore, subject to the FTCA.  *See Voyles v. Smithkline Beecham Corp. (In re Collins)*, 524 F.3d 249, 252 (D.C. Cir. 2008); *Expeditions Unltd. Aquatic Enter. v. Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977).

The FTCA incorporates state law, including the elements of an alleged tort as defined by state tort law.  *Tri-State*, 341 F.3d at 576.  Since the alleged acts and omissions giving rise to the plaintiffs' negligence claim occurred in the District of Columbia, the law of the District of Columbia applies and the United States is only liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  Thus, the liability of the United States is the same as that of the District of Columbia as to its sidewalks, streets or highways.

### 2.      Negligence

Under District of Columbia law, which applies under the FTCA, the plaintiff in a negligence action must demonstrate three elements: that there was "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach."  *Simms v. District of Columbia*, 699 F. Supp. 2d

217, 227 (D.D.C. 2010) (quoting *Wash. Metro Area Transit Auth. v. Ferguson*, 977 A.2d 375,

377 (D.C. 2009)); *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006)

("In the District of Columbia, as elsewhere, to establish negligence a plaintiff must prove a duty

of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage

to the interests of the plaintiff, proximately caused by the breach.") (citations and internal

quotation marks omitted); *Appleton v. United States*, 180 F. Supp. 2d 177, 182 (D.D.C. 2002) (in

FTCA negligence suit, plaintiff "bears the burden of proof, by a preponderance of the evidence,

to demonstrate the applicable standard of care, deviation from that standard, and the casual [sic]

relationship between the deviation and plaintiff's injury") (citing *Messina v. District of*

*Columbia*, 663 A.2d 535, 537-38 (D.C. 1995)); *Massengale v. Wash. Metro. Area Transit Auth.*,

983 F. Supp. 210, 215 (D.D.C. 1997) ("In order to establish a claim for negligence, it is

incumbent upon a plaintiff to prove: (1) a duty, owed by the defendant to the plaintiff, to

conform to a certain standard of care, and (2) a breach of this duty by the defendant, (3) which

proximately caused injury to the plaintiff.").  As discussed below, the plaintiffs have failed to

carry their burden on each of these elements.

### B.   The Defendant Did Not Breach A Duty of Care.

There is no dispute that the area of the sidewalk where Mrs. Girdler fell on October 3,

2008 was not in pristine, perfect condition.  That fact, standing alone, however, is insufficient to

render the United States liable in negligence for any injuries sustained by the plaintiffs.  *See*

*Pazmino v. Wash. Metro. Area Transit Auth.*, 638 A.2d 677, 680 (D.C. 1994) ("[T]he mere

happening of an accident does not constitute proof of negligence.") (citing *District of Columbia*

*v. Davis,* 386 A.2d 1195, 1200 (D.C. 1978) (The "mere happening of an accident does not

impose liability or reveal proof of negligence.")); *District of Columbia v. Cooper*, 445 A.2d 652,

655 (D.C. 1982) ("[T]he [defendant] is not an insurer of the safety of those who utilize its streets

and sidewalks."); *Jones v. Safeway Stores, Inc.*, 314 A.2d 459, 460 (D.C. 1974) ("'The mere

happening of an accident does not impose liability or permit an inference of negligence.'")

(quoting *Paylor v. Safeway Stores, Inc.*, 225 A.2d 312, 314 (1967)).  Instead, the plaintiffs must

establish the standard of care owed by the defendant to pedestrians using the sidewalks

surrounding the NASM, and the defendant's failure to provide that care to the plaintiffs.

### 1.      The Standard of Care

The defendant is required to maintain the sidewalk adjacent to the NASM in "a

reasonably safe condition."  *Cooper*, 445 A.2d at 655; *Klein v. District of Columbia*, 409 F.2d

164, 167 (D.C. Cir. 1969); *see also Newman v. United States*, 248 F. Supp. 669, 670 (D.D.C.

1965) (in FTCA action, "the liability of the United States . . . is the same as that of the District of

Columbia as to its streets or highways.  The rule is, of course, that while neither the District of

Columbia nor the United States . . . is an insurer of the safety of every passenger, nevertheless it

is under an obligation to maintain its highways and roadways in a reasonably safe condition for

travel in the ordinary mode").  In determining whether the defendant exercised reasonable care in

the maintenance of the sidewalk adjacent to the NASM, the Court must first determine whether

the triangular depression in the sidewalk made it unsafe or constituted a "tripping hazard."  Pls.'

Findings and Conclusions, ECF No. 47, ¶ 41.  Only if the condition of the sidewalk was not

"reasonably safe" is the Court then required to consider whether the defendant failed to conduct

an appropriate inspection that would have revealed this hazard and also whether the defendant

failed to take appropriate measures to remediate it in a timely fashion.  Pls.' Trial Brief, ECF No.

36, at 15-16; *see also* Pls.' Findings and Conclusions, ECF No. 47, at 16 (arguing that "a careful,

critical scrutiny of the public sidewalk around Tree No. 922 should have and would have

uncovered the trip ledge, and its immediate need for remediation or a warning given its location

beside the vendor's vehicle which drew pedestrians to its side."). As the plaintiffs point out, *see

id.*, the defendant may be liable under the FTCA when it breaches its duty to perform an

"appropriate level of inspection and maintenance" for public sidewalks. *Husovsky v. United

States*, 590 F.2d 944, 950 (D.C. Cir. 1978).

The Court finds that the plaintiffs cannot meet the threshold issue of establishing that the

triangular depression in the sidewalk constituted a hazard. *See Williams v. District of Columbia*,

646 A.2d 962, 963 (D.C. 1992) (summary judgment for defendant affirmed in case where

plaintiff fell after her heel was caught in one-half inch gap between bricks on median strip,

holding that "[e]ven if a genuine issue of fact remained [about whether defendant had notice], as

a matter of law appellant could not recover because any defect was de minimis."); *Tucci v.

District of Columbia*, 956 A.2d 684, 699 (D.C. 2008) ("Damages of this type are not enough, by

themselves, to show an 'unreasonably dangerous' condition or negligence on the part of the

District."); *District of Columbia v. Freeman*, 477 A.2d 713, 718-19 (D.C. 1984) ("The existence

of prior notice," is not enough, however; a plaintiff must demonstrate that the street is "in fact

unreasonably dangerous."); *Proctor v. District of Columbia*, 273 A.2d 656, 659 (D.C. 1971)

("The rule is well established that the District of Columbia is not to be made an insurer of the

safety of pedestrians using its sidewalks and is only required to maintain them in a reasonably

safe condition."); *Wash. Gas Light Co. v. Jones*, 332 A.2d 358, 361 (D.C. 1975) (Harris, J.,

dissenting); *District of Columbia v. Barnard*, 144 A.2d 418 (D.C 1958); *District of Columbia v.

Williams*, 46 A.2d 111, 112 (D.C. 1946); *Klein v. District of Columbia*, 409 F.2d 164 (D.C. Cir.

1969).

In making this finding, the Court has reviewed the expert testimony and the photographs

presented at the bench trial, and evaluated this evidence against the requirements of applicable property maintenance regulations.  Such local building codes are "evidence of a standard which the [trier of fact] could consider in determining whether the defendants had exercised due care according to their respective responsibilities. . . . This action of the responsible public authorities is relevant in determining the common law standard of care to be observed by defendants for the safety of pedestrians."  *Curtis v. District of Columbia*, 363 F.2d 973, 975 (D.C. Cir. 1966); *see also Klein*, 409 F.2d at 166-167.

The code in effect at the time of Mrs. Girdler's fall on October 3, 2008, was the District of Columbia Construction Code ("DCCC") (2008).  Dolhon Aff. ¶ 2.  The DCCC consists of multiple codes, including the D.C. Property Maintenance Code, compliance with which is mandatory.  Trial Tr. 82:25-83:10, July 11, 2012 A.M. (Dolhon).  The D.C. Property Maintenance Code, in turn, consists of the 2006 International Code Council's ("ICC") International Property Maintenance Code ("IPMC"), as amended by the administration and enforcement provisions of the Construction Codes Supplement, 12G DCMR Property Maintenance Code Supplement.[11]  *See* Trial Tr. 76:17-25, July 11, 2012 A.M. (Dolhon), ECF No. 52; ECF No. 38-1 at 21 (Int'l Prop. Maintenance Code (Int'l Code Council, Inc. 2006) ("IPMC"), *available at* International Code Council website: http://publicecodes.cyberregs.com/icod/ipmc/2006f2/index.htm).

Two provisions in the IPMC set forth the applicable standard of care for the maintenance of sidewalks: Section 102.2, which requires that "[e]quipment, systems, devices and safeguards required by this code" are "maintained in good working order;" and Section 302.3, which

---

[11] The ICC produces a number of model codes in addition to the Property Maintenance Code, including the Building Code, Mechanical Code, Electrical Code, and Plumbing Code.  *See* Trial Tr. 76:2-9, July 11, 2012 A.M. (Dolhon), ECF No. 52.

requires that "[a]ll sidewalks . . . be kept in a proper state of repair, and maintained free from hazardous conditions."  IPMC §§ 102.2, 302.3; *see also* Trial Tr. 77:14-21, July 11, 2012 A.M. (Dolhon), ECF No. 52; Dolhon Rep., Def's Ex. 18, at 9-10; Dinoff Aff. ¶ 9.  Commentary to IPMC Section 302.3 states that this provision requires "that all sidewalks . . . are usable and kept in proper repair" and when they "have deteriorated to a condition that presents a hazard to pedestrians [they] must be repaired . . . to eliminate the hazard and thus reduce the potential for accidents or injuries."  Dinoff Aff., Ex. 1, ECF No. 38-1, at 23.  As the defense expert explains, this commentary "suggests that conformance of the specified requirements be consistent with a 'reasonable level of protection' for health and safety (Section 301.1 Scope) and that the sidewalk be 'usable' (Section 302.3)."  Dolhon Rep., Def's Ex. 18, at 10.

While the experts for each side agree that IPMC Section 302.3 provides the applicable regulation for the maintenance of sidewalks, their opinions diverge on whether this IPMC standard has been further defined, with additional guidance incorporated into D.C.'s Property Maintenance Code.  Specifically, the plaintiffs point to guidelines and minimum maintenance criteria for sidewalks promulgated by the American National Standards Institute ("ANSI") in conjunction with the American Society for Testing and Materials ("ASTM"),[12] and assert that these guidelines not only provide a national standard of care but also apply in this jurisdiction and to this case.  In support of the plaintiffs' argument that the Court should consider the ANSI and ASTM guidelines in evaluating the applicable standard of care, the plaintiffs point out that the defendant's own safety manual provides for "the implementation and supplementation of the regulations and codes governing occupational safety and health, environmental management . . . as promulgated by such agencies and organizations including but not limited to: . . . the

---

[12] Both ANSI and ASTM are organizations that develop voluntary consensus standards.

American National Standards Institute and the International Code Counsel [sic]."  Pls.' Findings

and Conclusions, ECF No. 47, ¶ 36; Dolhon Rep., Def.'s Ex. 18, at 3 (quoting Def.'s Resp. to

First Set of Interrogatories, Req. No. 5(a)).[13]

The ANSI/ASTM guideline on which the plaintiffs heavily rely is ANSI/ASTM F 1637,

entitled "Standard Practice for Walking Surfaces."  This guideline sets forth the variation in

levels on a walking surface that constitute an unsafe condition requiring remediation.  Dinoff

Aff. ¶ 7.  ANSI/ASTM F 1637 requires "whenever possible" that "[a]djoining walkway surfaces

. . . be made flush," but "[c]hanges in levels of less than ¼ in. (6 mm) in height may be without

edge treatment."  Dinoff Aff., Ex. 1, at 11 (STANDARD PRACTICE FOR SAFE WALKING SURFACES,

Designation: F 1637-07 (2007) ("ANSI/ASTM F 1637"), at §§ 5.2.1 and 5.2.2).  Changes in

levels of over ¼ inch, however, trigger special treatment.  Specifically, "[c]hanges in levels

between ¼ and ½ in. (6 and 12 mm)" must be beveled with a short slope or rise, and "[c]hanges

in levels greater than ½ in. (12 mm)" must be "transitioned by means of a ramp or stairway."  *Id.*

(ANSI/ASTM F 1637, §§ 5.2.3 and 5.2.4).  Based upon these guidelines, the plaintiffs contend

that "edges more than ¼" in. high are hazardous and unacceptable unless they are treated with a

sloped transition."  Pls.' Findings and Conclusions, ECF No. 47, ¶ 40.   Set against this

guideline, the plaintiffs' expert opined that the unevenness presented by the 1 and 3/8 inch ledge

of the upraised SE flag near Tree No. 922 constituted a tripping hazard requiring a transition or a

warning about its existence.  Dinoff Aff. ¶¶ 5, 13; Trial Tr. 38:12-17, July 9, 2012 P.M. (Dinoff),

---

[13] The plaintiffs' expert also cites the testimony in a wholly unrelated case of the Chief of the D.C. Department of
Transportation, Street and Bridge Maintenance Division, to support his opinion that ANSI/ASTM F 1637 sets forth
the standard of care in the maintenance of sidewalks followed in this jurisdiction.  Dinoff Aff. ¶ 8.  This testimony,
however, is only minimally helpful to the plaintiffs.  During a videotaped deposition on April 14, 2010, the D.C.
government official indicated that "[w]e do use, as a rule of thumb, the ANSI standard," which is "a half inch," but
also made clear that "the District of Columbia does not have a formal specification for what constitutes a . . .
tripping hazard or . . . unsafe vertical ledge," *but see* Dinoff Aff., Ex. 3 at 26 (Deposition of Francesco Pacifico in
*Wooldridge v. District of Columbia*, 2009 CA 001293V, Superior Ct., Civ. Div.); *see also id.* at 27 ("But D.C.
government, as far as I know, as I sit here today, has not formally adopted the ANSI standard.").

ECF No. 49.  The plaintiffs suggest that conspicuous warnings about this uneven portion of the sidewalk were warranted.  *See* Dinoff Aff. ¶ 12 ("The defendant should have effectively marked and warned sidewalk users of the dangerous sidewalk conditions.").

The defendant disputes the relevance of ANSI/ASTM F 1637, contending that the D.C. Property Maintenance Code has not adopted this guideline.  According to the defendant, ANSI/ASTM F 1637 is merely an industry guideline and is not mandated by the code to be used. Trial Tr. 81:8-10–82:24, 102:16–103:7, July 11, 2012 A.M. (Dolhon), ECF No. 52.  In response to a question from the Court, Mr. Dolhon confirmed that while the ICC produces model codes, similar to the ASTM producing guidelines like ANSI/ASTM F1637, the code is a model until it is adopted, and in this jurisdiction the Property Maintenance Code has been adopted by the District of Columbia, while the code officials of the District of Columbia have not adopted ANSI/ASTM F 1637.  *See id.* 81:11–82:23.  Indeed, the plaintiffs' expert conceded that ANSI/ASTM F 1637 was neither a statute nor a code provision, was not mandatory and did not have the compulsion of the force of law.  Trial Tr. 54:6-18; 56:10-15, July 9, 2012 P.M. (Dinoff), ECF No. 49; Dolhon Aff. ¶ 4 ("In the absence of ASTM/ANSI, standards being adopted by reference by the *Property Maintenance Code*, these standards are only guidelines and are not code mandated standards nor do they represent the industry standard of care.").

Reliance on professional guidelines or standards is a generally appropriate methodology for experts to use when opining on an applicable standard of care.  *See, e.g.*, *D.C. Hous. Auth. v. Pinkney*, 970 A.2d 854, 864-66 (D.C. 2009) (plaintiff's expert's reliance on American Society of Mechanical Engineers regulation that when an elevator door reaches the full open position, the floor of the car and landing be "substantially level" established standard of care and the owner's breach of that standard in case where tenant was injured while alighting from elevator that failed

to align or become substantially level with the landing); *Waldman v. Levine*, 544 A.2d 683, 691 (D.C. 1988) ("A legal expert's use of the Code [of Professional Responsibility] in determining the standard of care required in a legal malpractice case is not unlike the use of practice codes in other negligence contexts."); *Leiken v. Wilson*, 445 A.2d 993, 1002 (D.C. 1982) (traffic regulations); *Menzel v. Morse*, 362 N.W.2d 465, 471 n.4 (Iowa 1985) (private safety code, maintenance manual). Yet, because voluntary guidelines do not amount to legal requirements because they have not been formally adopted as definitive criteria by which the legality of activity will be measured, caution must be exercised to ensure that they are clearly relevant and applicable to the circumstances presented in a negligence suit.

> **2.      Application of the Standard of Care: The Defendant Did Not Breach Any Duty in the Maintenance of the Sidewalk.**

In determining whether the defendant provided the proper standard of care, the Court must first look to the applicable regulatory requirements for maintenance of the sidewalk at issue. Those requirements are set out in the D.C. Property Maintenance Code. This Code, and its commentary, requires that the sidewalk be maintained in a condition that is "free from hazardous conditions" and is "usable." The defense expert opined that the commentary's term "usable" means that a condition does not impede pedestrian traffic and allows for the use of the sidewalk. *See* Trial Tr. 77:22–78:25, July 11, 2012 A.M. (Dolhon), ECF No. 52. The Court agrees.

In this case, the raised edge caused by a triangular depression in the sidewalk identified by the plaintiffs as the location where Mrs. Girdler tripped on October 3, 2008 is a fairly small and isolated portion in the mid-point of a 16-foot wide sidewalk that, after discounting the area of the walkway covered by vendors' canopies, had approximately 9 feet of walking space available. The small portion of the sidewalk with a depression in the corner where four flags of

concrete met did not prohibit the use of that sidewalk or render it unusable.  Moreover, the Court

does not find that the depressed corner of one flag presented a "hazardous condition" that would

alert the defendant's employees that the sidewalk's condition would foreseeably cause an injury

and therefore warrant immediate maintenance or repair.  The triangular depression in the NE flag

showed some erosion around the edges where the SE and NW flags met and along a diagonal

crack, but the center of the depression was largely filled with the sidewalk surface to support

pedestrians.  In short, this small depression simply did not present a hazard to pedestrians.[14]

Moreover, even if the ANSI/ASTM F 1637 guidance applied here, the Court's evaluation

of the condition of the sidewalk would not change for at least two reasons.  First, the plaintiffs

assert that Mrs. Girdler tripped on an uneven portion of the sidewalk that exceeded the one-half

inch or greater deviation measure provided in ANSI/ASTM F 1637, but their proof of the

measurement of the unevenness is unreliable both because it is unclear whether the measurement

was taken at the precise point where Mrs. Girdler tripped, and because the measurement, even if

at the right place, did not obtain the relevant figure.  The picture Mr. Girdler took on the date of

his wife's fall shows the triangularly shaped eroded corner of the NE flag.  Notably, the erosion

did not create a hole in the sidewalk since the middle of the triangle clearly shows an "island"

with a remaining portion of the sidewalk.

Mr. Girdler used his finger on the date of Mrs. Girdler's fall to measure how much the SE

flag was raised from the soil.  He did not see Mrs. Girdler fall, however, and measured this spot

only because this was the only defective part of the sidewalk that he observed in the area, not

---

[14] Since the Court finds that the sidewalk condition was not hazardous, the plaintiffs' claim that the defendant had a duty to warn pedestrians about that condition is also unavailing.

because he observed Mrs. Girdler's foot caught in the sidewalk defect.  Trial Tr. 10:4-5, July 11,

2012 A.M., ECF No. 52 (Q. "Did you see her fall?"  A. "I did not."); *id.* 30:21-22 (Q. "You did

not see her fall; is that correct?"  A. "I did not."); *id.* 34:24-25–35:1-3 (Q. "Is it a fact that you

took the -- a picture of the area that's depicted in Defendant's Exhibit Number 1 because at the

time it was, as you state, the only broken place in the whole sidewalk?"  A. "The best I could

tell.").  Even presuming this was the specific unevenness in the sidewalk that caused Mrs.

Girdler to trip, the fact that he measured down to the soil fails to take account of the concrete

island within the triangular depression large enough for a footstep.  In other words, measuring

the height of the gap *in between* the flags is not the same as measuring unevenness *in the heights*

of the flags.  No measure of the difference in levels, if any, between the surface of the "raised

ledge" of the SE flag and the surface of the "island" was presented to establish a deviation

exceeding the ANSI/ASTM guidance.

Highlighting the lack of clarity concerning the exact uneven ledge over which Mrs.

Girdler tripped is the fact that the plaintiffs assert that she tripped over the "vertical trip-ledge

along the east-west extending midline grove," Pls.' Trial Brief, ECF No. 36 at 4, which is the

northern edge of the SE flag, while the plaintiffs' expert appeared to have measured a different,

western edge of the same SE flag.  Specifically, the plaintiffs' expert testified that he measured

the difference in elevation "between the height of the southeast flag and the height of the

southwest flag in the area where Mrs. Girdler fell" and determined "the difference was on the

order of one and three-eighths inch."  Trial Tr. 52:15-18, July 9, 2012 P.M. (Dinoff), ECF No.

49.  These are simply two totally different edges, or "ledges," with the surface heights varying all

along the edges, as the plaintiffs' expert conceded.  *Id.* 32:14-18 ("It is very hard to measure a

weathered sidewalk and say exactly what it is . . . as you work along, it's three-eighths here, half

an inch there.").

Second, the one-half inch or greater deviation measure provided in the ANSI/ASTM F 1637 guidance, standing alone, is too blunt of a tool for evaluating the existence of a hazardous condition.  Instead, the hazardousness of such a deviation must be assessed in context, considering, *inter alia*, the location in the sidewalk of the uneven levels, the size of the area with the uneven levels, the width of the sidewalk overall, and the contours of space created by the uneven levels.  In this case, the triangular area in issue was in the middle of the sidewalk, readily visible to pedestrians walking along the NASM, if they were looking straight ahead where they were walking.  *Accord Cooper*, 445 A.2d at 660-661 (declining "to establish an arbitrary negligence determinant in the height or depth of defects in city sidewalks," noting that rather than "establish such a determinant, . . . we look to the full panorama of evidence in the case at bar."); *Tucci*, 956 A.2d at 699 ("What is an actionable defect in the driveway, or what depressions and minor defects are sufficient to establish municipal negligence, depends upon all the circumstances of the particular case, taking into consideration the physical structure and nature of the area, its climate, the character of the street, and the kind and amount of travel at the location concerned.") (internal citations and quotation marks omitted).[15]  The size of the triangular area appears from Mr. Girdler's photograph to be relatively small, less than 13 by 11 inches (which was the approximate measurement of the larger patched area, Dolhon Aff. ¶ 7),

---

[15] The plaintiffs rely heavily on a case from outside this jurisdiction, *Kasparian v. AvalonBay Communities, Inc.*, 156 Cal. App. 4th 11, 27 (Cal. App. 2d Dist. 2007), where the court cited the ANSI/ASTM guidance on sidewalk safety, but this case is unavailing.  *See* Pls.' Trial Brief, ECF No. 36, at 13-14.  In that case, the ANSI/ASTM guidance was not determinative; instead the court indicated that a number of factors should be considered in evaluating whether "a given defect is trivial," stating that "[w]hile size may be one of the most relevant factors to the decision, it is not always the sole criterion.  Instead, the court should determine whether there existed any circumstances surrounding the accident which might have rendered the defect more dangerous than its mere abstract depth would indicate.  As such, the court should view the intrinsic nature and quality of the defect to see if, for example, it consists of the mere nonalignment of two horizontal slabs or whether it consists of a jagged and deep hole.  The court should also look at other factors such as whether the accident occurred at night in an unlighted area.  Furthermore, the court should see if there is any evidence that other persons have been injured on this same defect." *Kasparian*, 156 Cal. App. 4th at 27 (citations and internal quotation marks omitted).

and covered such a minor fraction of the much wider sidewalk that it did not impede the use of

the sidewalk.  Furthermore, the contours of the triangular area showed that despite the possible

depth from the raised ledge to the soil, the triangular area was substantially filled by a remaining

chunk of sidewalk that could accommodate a person's footstep.

In conclusion, the plaintiffs have failed to show that the condition of the sidewalk

adjacent to the NASM at the time of Mrs. Girdler's fall was hazardous and not reasonably safe.

Hence, the plaintiffs have not shown that the defendant breached any duty of care owed to

pedestrians using the sidewalk.  Without negligence there cannot be liability, even where the

plaintiff has suffered a fall.[16]  *Cooper*, 445 A.2d at 655 (plaintiff bears the burden of

"establishing that a violation of the reasonable standard of care is the proximate cause of the

injury sustained.  The mere happening of an accident does not meet this burden."); *see also id*. at

663 ("Unfortunately, the fact is that persons often fall in the absence of negligence on anyone's

part.") (Belsen, J., dissenting).

### C.   Plaintiffs Cannot Establish Proximate Causation Since Mrs. Girdler's Negligence Contributed to Her Injury.

Even were the plaintiffs able to establish a breach of a duty owed by the defendant in this

case, they would be unable to establish another essential element of her negligence claim:

namely, that the condition of the sidewalk proximately caused her injury.  "It is a bedrock rule of

tort law" that a defendant is only liable for "harms he proximately caused."  *United States v.*

*Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011) (citing RESTATEMENT (THIRD) OF TORTS: LIABILITY

FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. a (2010) (calling proximate cause a

"requirement[] for liability in tort"); W. Page Keeton *et al.*, PROSSER AND KEETON ON THE LAW

OF TORTS § 41, at 263 (5th ed. 1984) ("An essential element of the plaintiff's cause of action for

---

[16] The failure of the plaintiffs to establish any negligence on the part of the defendant defeats Mr. Girdler's claim in Count II of the Complaint for loss to him of Mrs. Girdler's housekeeping services, and this claim is dismissed.

negligence, or . . . any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.  This connection usually is dealt with by the courts in terms of what is called 'proximate cause' . . . .")).  While the plaintiffs assert that "the vertical ledge created by the uplifted corner of the SE flat caused Mrs. Girdler's trip and fall," Pls.' Findings and Conclusions, ECF No. 47, ¶ 57; *see also id.* ¶¶ 24, 41, 42, the evidence at trial made clear that Mrs. Girdler was simply not looking where she was going.  The plaintiffs concede this point in their own findings of fact, stating that Mrs. Girdler "was distracted by the vendor's suspended merchandise" just before she tripped.  *Id.* ¶ 55.  They vividly describe Mrs. Girdler as "engulfed with the compound visual demands of anticipating approaching tourists, while being regaled on her left side by colorful merchandise and the enticing calls from the vendors intent on getting her attention."  Pls.' Trial Brief, ECF No. 36, at 6.

In this jurisdiction, a plaintiff's contributory negligence is an affirmative defense and may act as a complete bar to liability.  *See Mahnke v. Wash. Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 133 (D.D.C. 2011); *see also O'Connor v. District of Columbia*, 921 F. Supp. 5, 7 (D.D.C. 1996) ("In the District of Columbia, contributory negligence operates as a complete bar to recovery.") (citing *District of Columbia v. Brown*, 589 A.2d 384, 388 (D.C. 1991)); Standardized Civil Jury Instructions for the District of Columbia § 5.15 ("The defendant is not liable for the plaintiff's injuries if the plaintiff's own negligence is a proximate cause of [her] injuries.").  Pedestrians, such as Mrs. Girdler, have a duty to act reasonably to ensure their own safety.  *See Lyons v. Barrazotto*, 667 A.2d 314, 322 (D.C. 1995) ("A pedestrian also has a duty to exercise reasonable care for the protection of his or her own safety") (citing *Washington v. A. & H. Garcias Trash Hauling*, 584 A.2d 544, 546 (D.C. 1990)).  Pedestrians with a history of

falling, as is the case for Mrs. Girdler, have a heightened duty to watch where they are walking

in order to maintain their balance and avoid tripping over minor unevenness and cracks that

inevitably arise in sidewalks.

The case *Poyner v. Loftus*, 694 A.2d 69 (D.C. 1997), which is relied upon by the

defendant, is particularly instructive. In *Poyner*, the plaintiff was a legally blind man who could

see six to eight feet in front of him. He fell from an elevated platform after someone called his

name and he turned to look in the direction of the voice but continued to walk forward. *Id*. at 70.

The trial court granted summary judgment for the defendant, finding that the plaintiff's actions

"clearly violate an objective reasonableness standard. . . . [N]o reasonable jurors could conclude

that the plaintiff was not negligent when he continued to walk on an elevated surface with

limited vision while his head was turned away from the direction of travel in an area in which he

was not very familiar." *Id*. The Court of Appeals agreed with the trial court that the plaintiff had

not exercised reasonable care and that his own contributory negligence proximately caused the

accident. *Id*. at 71. The appellate court highlighted the fact that the plaintiff "acknowledged that

his attention was distracted when someone called his name, and that he turned his head to the

right, but continued to walk forward. At the critical moment, according to his own testimony,

[the plaintiff], who could see six to eight feet in front of him and was aware of his handicap, did

not look where he was going." *Id*. Given the plaintiff's conceded contributory negligence, the

court "agree[d] with the trial judge that this constituted contributory negligence and that no

impartial jury could reasonably find otherwise." *Id.*; *see also Mixon v. Wash. Metro. Area*

*Transit Auth.*, 959 A.2d 55, 60 (D.C. 2008) (affirming the trial court's grant of summary

judgment for the defense, concluding that plaintiff's assertion that he fell on a slippery substance

on the stairs was "nothing more than speculation" and that there was no evidence of causation

because plaintiff "simply has not shown, beyond his own speculation, that any act or omission by [defendant] had anything to do with his fall"); *Twyman v. Johnson*, 655 A.2d 850, 853 (D.C. 1995) (holding that plaintiff's testimony did not tie her fall to a defective condition of the stairs, and her bare statement that she did not know what caused her to fall was insufficient for a reasonable jury to find that the conditions of the steps was the cause rather than that "she missed a step or lost her balance while not holding the guardrail (she was carrying a bag of trash at the time)").

Like the facts in *Poyner*, the facts at trial in this case establish that Mrs. Girdler did not look where she was going or see what was plainly there to see, and therefore she did not exercise reasonable care.  As a result, her contributory negligence is a complete bar to her recovery in this case.[17]

## IV.    CONCLUSION

Upon consideration of the foregoing findings of fact and conclusions of law, the Court

---

[17] In an effort to defeat the defendant's contributory negligence claim, the plaintiffs contend that Mrs. Girdler's distraction by the vendors "was reasonable and foreseeable, and Defendant has failed in its burden to show that her behavior was negligent." Pls.' Findings and Conclusions of Law, ECF No. 47, ¶ 56.  In support of this contention, the plaintiffs rely upon a "judicial trend" reflected in the Restatement of Torts, 2d Ed., § 343A, suggesting that liability may be appropriate for "known or obvious" harms "where the possessor has reason to expect that the [visitor's] *attention may be distracted.*" Pls.' Supp. Trial Brief, ECF No. 45, at 2 (emphasis in original).  Under this Restatement framework, a danger that is known or obvious does not eliminate the possessor's liability as a matter of law only when the possessor should foresee or anticipate harm from the known or obvious danger due to other factors.  This effort by the plaintiffs to shift the blame for Mrs. Girdler's failure to pay attention to her step is unavailing for several reasons.  First, the small depression in the sidewalk with about 9 feet of usable pedestrian space did not present such an obvious risk of harm to pedestrians that it was known to the defendant.  Second, to the extent that the vendors parked along Independence Avenue adjacent to the NASM presented a foreseeable distraction, this is only one of myriad types of distractions that pedestrians on city sidewalks regularly must confront and simply does not excuse pedestrians' own obligation to watch where they are going.  Def.'s Findings & Conclusions ¶¶ 48-65.  Finally, the cases from outside this jurisdiction cited by the plaintiff in its Supplemental Trial Brief, ECF No. 45, are not only nonbinding on this Court but also easily distinguishable since none involves a pedestrian on a public sidewalk.  *See, e.g.*, *Kentucky River Med. Ctr. v McIntosh*, 319 S.W.3d 385 (Ky. 2010) (hospital could reasonably expect paramedic treating a critically-ill patient could be distracted and fail to protect herself from protruding curb at the entrance to a hospital's emergency room); *Fox v. Food Lion, Inc.*, 2000 Tenn. App. LEXIS 642 (Tenn. Ct. App. Sept. 21, 2000) (although defendant partially responsible, plaintiff was also partially responsible for tripping over empty display case placed in middle of grocery store aisle since she was distracted by looking at goods).

concludes that (1) the plaintiffs have failed to establish by a preponderance of the evidence that

the defendant was negligent in the maintenance of the sidewalk adjacent to the NASM in the area

where Mrs. Girdler fell on October 3, 2008; and (2) notwithstanding any breach of a duty by the

defendant, the defendant has proven through the plaintiffs' admissions, that Mrs. Girdler

contributed to her fall by looking at the goods offered for sale by vendors parked along the

sidewalk and failing to exercise due care in attending to where she was walking.

     Accordingly, judgment will be entered for the defendant.  A separate Order consistent

with these findings of fact and conclusions of law accompanies this Opinion.


**DATED:  February 12, 2013**


                                   _____

                                   BERYL A. HOWELL
                                   United States District Judge